1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**THE ALTMAN LAW GROUP**
BRYAN C. ALTMAN (SBN 122976)
JOEL E. ELKINS (SBN 256020)
JORDAN G. COHEN (SBN 281942)
6300 Wilshire Blvd. Suite 980
Los Angeles, California 90048
Telephone: (323) 653-5581
Fax: (323) 653-5542

Attorneys for Plaintiff SUPER CHEFS, INC.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# CENTRAL DIVISION

| | |
|---|---|
| SUPER CHEFS, INC., a California Corporation,<br><br>          Plaintiff,<br><br>    vs.<br><br>SECOND BITE FOODS, INC., a Minnesota Corporation, dba STONE GATE FOODS; TRUDEAU FOODS, LLC, a Delaware Limited Liability Company, dba STONE GATE FOODS; UNITED NATURAL FOODS, INC., a Delaware Corporation; and DOES 1 through 100.<br><br>          Defendants. | **CASE NO. 2:15-cv-00525-SJO-FFM**<br><br>**PLAINTIFF SUPER CHEFS, INC.'S FIRST AMENDED COMPLAINT FOR:**<br><br>• **BREACH OF WRITTEN CONTRACT (CONFIDENTIALITY AGREEMENT)**<br>• **BREACH OF WRITTEN CONTRACT (COMMISSION AGREEMENTS)**<br>• **FRAUD**<br>• **NEGLIGENT MISREPRESENTATION**<br>• **INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS**<br>• **NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS**<br>• **UNFAIR BUSINESS PRACTICES (B&P §17200 et seq.)**<br>• **ACCOUNTING**<br>• **DECLARATORY RELIEF**<br>• **INJUNCTIVE RELIEF (FRCP 65)**<br><br>**DEMAND FOR JURY TRIAL [FRCP 38(b)]** |

Plaintiff SUPER CHEFS, INC. ("SUPER CHEFS") hereby complains and alleges as follows:

1.      This Court has jurisdiction under 28 USC §1332.  SUPER CHEFS is a citizen of Nevada.  SUPER CHEFS believes that SECOND BITE FOODS, INC. dba STONE GATE FOODS ("STONE GATE") is a citizen of Minnesota.  The amount in controversy exceeds $75,000.

2.      By written agreement, DEFENDANTS have consented to the jurisdiction of this Court and to the laws of California as the governing substantive law.

3.      Venue is proper in this judicial district pursuant to 28 USC §1391(b)(2) as a substantial part of the events giving rise to SUPER CHEFS' claims occurred in this judicial district.  By written agreement, DEFENDANTS have waived any objection to venue.

4.      SUPER CHEFS is, and at all times mentioned in this Complaint was, authorized to operate in the State of California and authorized and qualified to do business in the County of Los Angeles.  SUPER CHEFS is a Nevada corporation with its headquarters in Los Angeles, California.

5.      Defendant STONE GATE is, and at all times mentioned in this Complaint was, authorized to operate by the State of Minnesota and authorized and qualified to do business in the County of Los Angeles.  STONE GATE is a Minnesota Corporation with its headquarters in South Shakopee, Minnesota.

6.      SUPER CHEFS is ignorant of the true names and capacities of Defendants sued herein as DOES 1 through 100, inclusive, and SUPER CHEFS will amend this Complaint to state their true names and capacities when they have been ascertained.

7.      SUPER CHEFS is informed and believes, and based thereon alleges, that at all times herein mentioned, Defendants, and each of them, were the agents and employees of each of their Co-Defendants and, in doing the things herein

PLAINTIFF SUPER CHEFS, INC.'S FIRST AMENDED COMPLAINT

mentioned, were acting in the course and scope of their authority as such agents and employees, and with the permission and consent of the other Co-Defendants.

## COMMON ALLEGATIONS

8.     7-Eleven, Inc. ("7-11"), one of the country's largest convenience store operators, had been seeking a product which contained fully cooked bacon wrapped around a hot dog ("bacon dog").  Specifically, 7-11 required that the bacon be of sufficient length to provide acceptable coverage on the hot dog, and, for at least two hours on the roller grill, the fully cooked bacon must remain attached to the hot dog and the bacon dog must remain moist, while retaining an acceptable appearance.  For years 7-11 had been seeking without success such a bacon dog to sell at its locations.  7-11's need for such a product was not known to the general public.

9.     SUPER CHEFS discovered 7-11's search for a marketable bacon dog through Henry Lopez ("Lopez"), a former 7-11 executive with whom SUPER CHEFS had been working on another project.  On April 3, 2012, SUPER CHEFS entered into a Consulting and Commission Agreement with Lopez, whereby Lopez would assist SUPER CHEFS to develop and market products such as the bacon dog.

10.     With Lopez's assistance, SUPER CHEFS began performing research and development on bacon dogs that would meet 7-11's standards.  SUPER CHEFS and Lopez did not publicize 7-11's search for a workable bacon dog while SUPER CHEFS worked to develop one that met 7-11's requirements.

11.     After significant research and testing, SUPER CHEFS developed the "SLIT METHOD," by which the bacon would be inserted into slits cut into the side of the hot dog and cooked using a special industrial oven, providing an efficient, economical means of ensuring that the bacon remained attached to the hot dog, the hot dog would remain moist and the bacon would not burn for a

**PLAINTIFF SUPER CHEFS, INC.'S FIRST AMENDED COMPLAINT**

1  minimum of two hours while on a roller grill, as 7-11 had been attempting to do

2  for years without success.

3         12.    During the research and development of the SLIT METHOD, SUPER

4  CHEFS sought to enter into an agreement  with a manufacturing company where,

5  in exchange for said manufacturing company being provided with (1) details of the

6  project and SUPER CHEFS' proprietary SLIT METHOD, (2) SUPER CHEFS'

7  methodology and technology to mass produce the bacon dogs efficiently, and (3)

8  access to SUPER CHEFS' contacts at 7-11 (hereinafter collectively referred to as

9  "SUPER CHEFS' TRADE SECRETS"), the manufacturing company would

10  provide its manufacturing facility or facilities and capability to mass produce the

11  bacon dogs for 7-11 and other companies, and provide SUPER CHEFS with a

12  commission per bacon dog sold to any and all companies.

13         13.    Accordingly, SUPER CHEFS approached Cher-Make Sausage

14  Company ("Cher-Make") to manufacture the bacon dogs.  But before SUPER

15  CHEFS would disclose to Cher-Make the nature and details of the endeavor,

16  SUPER CHEFS insisted on a non-disclosure agreement.  The two companies

17  entered into a confidentiality agreement on October 28, 2012.

18         14.    After hearing of the details of the project, Cher-Make informed

19  SUPER CHEFS that it was not equipped for manufacturing of the bacon dogs but,

20  on November 9, 2012, recommended to SUPER CHEFS a company doing

21  business as "Stone Gate Foods" that might be better suited for the project.

22         15.    Representatives of SUPER CHEFS met with representatives of

23  STONE GATE and, on December 1, 2012, the two companies entered into a

24  confidentiality agreement ("Confidentiality Agreement") similar to the non-

25  disclosure agreement that SUPER CHEFS had previously entered into with Cher-

26  Make.  Under the Confidentiality Agreement, signed by Robert Eversman, as

27  representative of STONE GATE, and Jerry Packer, as representative of SUPER

28  CHEFS, the parties agreed to safeguard and not to reveal or use for any other

purpose any confidential information disclosed by the other side.  The parties also agreed not to use any confidential information to "unfairly compete or obtain unfair advantage vis a vis Disclosing Party in any commercial activity which may be comparable to the commercial activity contemplated by the parties in connection with the [parties' current business relationship]."

16.    Under the Confidentiality Agreement, confidential information was defined to include "all information relating to formulas, manufacturing and/or production processes, recipes, customer lists and information, supplier lists and information, personnel of Disclosing Party, manuals, drawings, plans, designs, specifications, configurations, technologies or theory and all other information which may be disclosed by a Disclosing Party or to which a Receiving Party may be provided access to by a Disclosing Party, whether orally or in writing in accordance with this Agreement, or which is generated as a result of or in connection with the Business Purpose, which is not generally available to the public."

17.    Under the terms of the Confidentiality Agreement, SUPER CHEFS disclosed to STONE GATE the details of 7-11's search for a bacon dog and SUPER CHEFS' initial success to that point with the SLIT METHOD.  Shortly thereafter, SUPER CHEFS (through Jerry Packer) and STONE GATE (through Robert Eversman) entered into a Pro-Forma Manufacturing and Commission Agreement ("Commission Agreement").  Under the Commission Agreement, SUPER CHEFS would be responsible for research, development and marketing, and STONE GATE would be responsible for purchasing ingredients and packaging materials, and taking and fulfilling orders related to customers.  Under the Commission Agreement, the parties would agree on the selling price of the products sold and on the commission that SUPER CHEFS would receive for each product sold.

18.    Over the next year, SUPER CHEFS' research and development

**PLAINTIFF SUPER CHEFS, INC.'S FIRST AMENDED COMPLAINT**

personnel worked to refine the SLIT METHOD, including developing the knowledge of how bacon dogs using the SLIT METHOD could be produced efficiently for mass marketing; in particular, the necessity of cooking bacon dogs with a special industrial oven.  SUPER CHEFS invested a tremendous amount of effort, time, and resources in researching and testing industrial ovens that could cook the hot dogs and bacon uniformly and efficiently in a manner that would satisfy 7-11's requirements on the roller grill, and developing techniques to mass-produce the bacon dogs. locating several special industrial ovens.  STONE GATE suggested a tool for slitting multiple hot dogs at one time and ordered and secured a prototype for this purpose, but otherwise was not involved in the development process during this time frame.

19.    After SUPER CHEFS developed the SLIT METHOD in conjunction with the special industrial oven, SUPER CHEFS kept the SLIT METHOD in conjunction with the special industrial oven a secret from the general public.

20.    SUPER CHEFS has applied for a patent on the SLIT METHOD in conjunction with the special industrial oven.  SUPER CHEFS' patent application is currently pending.

21.    In or about February 2014, with the assistance of Lopez and his contacts at 7-11, SUPER CHEFS was able to meet with executives at 7-11 and provide samples of bacon dogs made by SUPER CHEFS using the SLIT METHOD in conjunction with the special industrial oven.  7-11 indicated that SUPER CHEFS had "broken the code" on the bacon dogs and that 7-11 was interested in test marketing the SLIT METHOD bacon dogs in some of its convenience stores, and, if sales of bacon dogs in the test markets were successful, 7-11 would be interested in purchasing large quantities of bacon dogs using the SLIT METHOD.  7-11's interest in purchasing bacon dogs using the SLIT METHOD  was not publicly known.

22.    Over the next few months, 7-11 placed orders for additional samples

PLAINTIFF SUPER CHEFS, INC.'S FIRST AMENDED COMPLAINT

of the bacon dogs using the SLIT METHOD in conjunction with the special industrial oven to further evaluate bacon dogs by 7-11 personnel at its corporate headquarters.  SUPER CHEFS produced these samples at a plant in Oregon, because STONE GATE did not yet have the special industrial ovens required to produce the SLIT METHOD bacon dogs.

23.    On or about March 28, 2014, STONE GATE sent to SUPER CHEFS a breakdown of costs for the two sizes of bacon dogs, one using a 2 ounce ("8/1") hot dog and one using a 4 ounce ("4/1") hot dog.  Each size provided a seven cent ($.07) commission to SUPER CHEFS.  This $.07 commission offer was communicated by Robert Eversman, STONE GATE's Vice President of Sales and Marketing, to Jerry Packer, President of SUPER CHEFS.  Shortly thereafter Jerry Packer communicated SUPER CHEFS' acceptance of the $.07 commission to STONE GATE.

24.    Over the next few months, STONE GATE claimed that it was having difficulties mass-producing the SLIT METHOD bacon dog and began experimenting with a bacon dog using a food adhesive ("ADHESIVE METHOD") to bind bacon to the hot dog.  STONE GATE informed SUPER CHEFS that it was having more success with the ADHESIVE METHOD and that the results were more aesthetically pleasing than the SLIT METHOD.  SUPER CHEFS agreed to the new method of adhering the bacon to the hot dog and assisted STONE GATE in perfecting the ADHESIVE METHOD.  The ADHESIVE METHOD employed the same cooking techniques, including the same special industrial ovens, that had been developed by SUPER CHEFS.  These techniques and the special industrial oven were unknown to STONE GATE prior to entering into the Confidentiality Agreement and Commission Agreement with SUPER CHEFS.

25.    Throughout the process of refining the manufacturing technique and developing the ADHESIVE METHOD, STONE GATE was in regular communications with SUPER CHEFS regarding the manufacturing process, the

**PLAINTIFF SUPER CHEFS, INC.'S FIRST AMENDED COMPLAINT**

equipment (including the special industrial oven) necessary for optimal cooking, suppliers, patents for both the SLIT METHOD and ADHESIVE METHOD, potential 7-11 retail price points, and requirements of United States Department of Agriculture.  In particular, SUPER CHEFS had originally drafted a Hazardous Analysis of Critical Control Points (HACCP) program for production of the bacon dog using the SLIT METHOD, as required by the Department of Agriculture. STONE GATE requested that SUPER CHEFS draft a HACCP program for production of bacon dogs using the ADHESIVE METHOD.  SUPER CHEFS did further analysis and determined that the same program originally drafted for the SLIT METHOD could be used for the ADHESIVE METHOD.  SUPER CHEFS sent a copy of this program to STONE GATE's research and development team in or about April, 2014.

26.     SUPER CHEFS, which had originally performed its research and development in an industrial oven that could cook the hot dogs and bacon uniformly and efficiently, was instrumental during this time in locating another oven which could do as good or better job for one-third the selling price.  STONE GATE purchased that lower cost oven, which it used and continues to use to this day to manufacture the bacon dogs.

27.     During this time (spring-summer 2014), SUPER CHEFS introduced STONE GATE to Tyson Foods as a potential supplier for the primary ingredients of the bacon dog: raw bacon and hot dogs.  It is PLAINTIFF'S understanding that STONE GATE eventually used Tyson Foods as its supplier for these primary ingredients.

28.     In or around May, 2014, SUPER CHEFS purchased a hot dog grill roller, which was similar to the type used at 7-11 convenience stores, for final testing of the bacon dogs at STONE GATE facilities.

29.     STONE GATE then used SUPER CHEFS' connections at 7-11 to negotiate a Non-Disclosure Agreement, a Pilot Agreement and later a

**PLAINTIFF SUPER CHEFS, INC.'S FIRST AMENDED COMPLAINT**

Manufacturing and Exclusivity Agreement with 7-11 to mass produce and supply 7-11 with bacon dogs for sale at its convenience stores.  Prior to entering into either of these agreements with 7-11, STONE GATE asked for input from SUPER CHEFS, its counsel and Henry Lopez.

30.     In an email dated April 3, 2014, Robert Eversman told SUPER CHEFS by email that "We won't enter into any agreements without your input prior to signing."  On April 16, 2014, Robert Eversman sent SUPER CHEFS a copy of the proposed agreement with 7-11, asking "Jerry and Team" to review and provide any comments and/or recommendations.  Plaintiff believes and thereby alleges that shortly thereafter, on or about April 17, 2014, STONE GATE entered into an exclusive manufacturing agreement with7-11.  Under this agreement STONE GATE has supplied and continues to supply to this day all bacon dogs being sold through 7-11 convenience stores.

31.     Despite the agreement between the parties, STONE GATE has refused to pay SUPER CHEFS the $.07 commission that SUPER CHEFS is entitled to under the agreement, or any commission whatsoever.   Rather, STONE GATE is improperly benefitting from the significant research, innovation, knowledge and investment provided by SUPER CHEFS.

32.     SUPER CHEFS has been informed that test markets have demonstrated that participating 7-11 stores will sell approximately ten (10) bacon dogs per day.  SUPER CHEFS has also been informed that by selling bacon dogs of varying sizes, it is likely that each participating 7-11 store will sell fifteen (15) bacon dogs per day.  SUPER CHEFS has been informed that the bacon dogs manufactured and sold by DEFENDANTS will be sold at approximately 8000 participating 7-11 stores in North America.  The $.07 commission owed to SUPER CHEFS by DEFENDANTS based upon sales of ten (10) bacon dogs sold per day at each of 7-11's approximately 8,000 participating stores is over $2,000,000.00 per year.  The $.07 commission owed SUPER CHEFS by DEFENDANTS based

**PLAINTIFF SUPER CHEFS, INC.'S FIRST AMENDED COMPLAINT**

upon sales of fifteen (15) bacon dogs sold per day at each of 7-11's approximately 8,000 participating stores is over $3,000,000.00 per year.

## FIRST CAUSE OF ACTION

## BREACH OF WRITTEN CONTRACT (CONFIDENTIALITY AGREEMENT)

### (SUPER CHEFS Against All DEFENDANTS and DOES 1 to 100)

33.     SUPER CHEFS herein incorporates all preceding paragraphs, as though fully set forth herein.

34.     On or about November 2012, SUPER CHEFS approached DEFENDANTS' food manufacturing companies, regarding the possibility of DEFENDANTS entering into an agreement with SUPER CHEFS in order to manufacture bacon dogs using the SLIT METHOD in conjunction with the special oven, to fulfill the needs of 7-11 and other companies, and, in exchange, SUPER CHEFS would receive a commission from DEFENDANTS for every bacon dog sold by DEFENDANTS to any and all companies.

35.     Prior to disclosing SUPER CHEFS' TRADE SECRETS to DEFENDANTS, SUPER CHEFS and DEFENDANTS entered into a written Confidentiality Agreement in which, in consideration for receipt of SUPER CHEFS' TRADE SECRETS, DEFENDANTS agreed not to use SUPER CHEFS' TRADE SECRETS to "unfairly compete" with SUPER CHEFS, or to "obtain unfair advantage" over SUPER CHEFS, to maintain the confidentiality of SUPER CHEFS' TRADE SECRETS, and not to use SUPER CHEFS' TRADE SECRETS in connection with any commercial activity which may be comparable to the commercial activity that the parties had contemplated upon entering into the Confidentiality Agreement.  A true and correct copy of the written Confidentiality Agreement is attached hereto as Exhibit A.

36.     In addition to the Confidentiality Agreement, SUPER CHEFS and

DEFENDANTS also entered into a written Commission Agreement.  Attached as Exhibit B is a true and correct copy of the Commission Agreement.  Pursuant to the Commission Agreement, DEFENDANTS were to receive, produce, invoice, and ship orders for products for customers that were secured by SUPER CHEFS. Both SUPER CHEFS and DEFENDANTS were required to mutually agree on the selling price for the products sold to customers secured by SUPER CHEFS.  The parties were also required to agree to the amount of commission to be received by SUPER CHEFS, prior to setting the selling price, and therefore prior to selling the products to customers secured by SUPER CHEFS.  The Commission Agreement also specified that "Neither PARTY may circumvent the other PARTY, nor interfere in the business of the other PARTY, in any manner whatsoever, whereby the financial well-being of the other PARTY is lessened or diminished."

37.     Robert Eversman, DEFENDANTS' Vice President of Sales and Marketing, entered into the Confidentiality Agreement and the Commission Agreement on behalf of DEFENDANTS.  In an email sent on Friday, November 16, 2012, Robert Eversman, DEFENDANTS' Vice President of Sales and Marketing, notified Jerry Packer, President of SUPER CHEFS in writing that DEFENDANTS had agreed to the terms of both the Confidentiality Agreement and the Commission Agreement.  In the same email, Robert Eversman, DEFENDANTS' Vice President of Sales and Marketing, provided Jerry Packer, President of SUPER CHEFS, signed copies of the Confidentiality Agreement and the Commission Agreement.  Attached as Exhibit C is a true and correct copy of the November 16, 2012 email from Robert Eversman, DEFENDANTS' Vice President of Sales and Marketing, to Jerry Packer, President of SUPER CHEFS.

38.     The parties' Confidentiality Agreement included a provision in which DEFENDANTS agreed:

> not to use any Confidential Information of the Disclosing Party to unfairly compete or obtain unfair advantage vis a vis Disclosing Party in any commercial activity which may be comparable to the commercial activity

contemplated by the parties in connection with the
Business Purposes;

Exh. A, Section 2d.

39.     Pursuant to Paragraph 2d of the Confidentiality Agreement, the
Confidentiality Agreement expressly precluded DEFENDANTS from using
SUPER CHEFS' TRADE SECRETS "to unfairly compete or obtain unfair
advantage" "in any commercial activity which may be comparable to the
commercial activity contemplated by the parties in connection with the Business
Purposes."

40.     Similarly, the Commission Agreement precluded DEFENDANTS
from selling bacon dogs manufactured by DEFENDANTS using SUPER CHEFS'
TRADE SECRETS to 7-11, without first agreeing with SUPER CHEFS as to the
price to be charged to 7-11, and as to the commission that would be received by
SUPER CHEFS.  In fact, STONE GATE never presented to SUPER CHEFS the
current pricing of the bacon dogs being marketed to 7-11.

41.     After SUPER CHEFS' TRADE SECRETS had been disclosed to
DEFENDANTS, pursuant to the terms of the Confidentiality Agreement and the
Commission Agreement, DEFENDANTS stated that they were interested in
manufacturing bacon dogs using the SLIT METHOD in conjunction with the
special oven, as well as manufacturing other products formulated by SUPER
CHEFS, and DEFENDANTS would pay a commission to SUPER CHEFS for
every unit of every product sold by DEFENDANTS.  The bacon dogs
manufactured using the SLIT METHOD in conjunction with the special oven
would be sold by DEFENDANTS to 7-11 and to other customers.

42.     In reliance on DEFENDANTS signing the Confidentiality Agreement
and the Commission Agreement, SUPER CHEFS spent a tremendous amount of
time and expended substantial energy and resources providing samples of bacon
dogs using the SLIT METHOD in conjunction with the special oven to 7-11,in
order to establish that the SLIT METHOD in conjunction with the special oven

**PLAINTIFF SUPER CHEFS, INC.'S FIRST AMENDED COMPLAINT**

met 7-11's needs and met with the approval of those in charge at 7-11.  After the
SLIT METHOD in conjunction with the special oven had been extensively
evaluated by those in charge at 7-11, 7-11 told SUPER CHEFS that it had "broken
the code" and developed the method for producing bacon dogs that 7-11 had been
seeking for years.

43.   After telling SUPER CHEFS that it had "broken the code" and
developed the method to produce the bacon dogs that 7-11 was looking for, 7-11
informed SUPER CHEFS that it was interested in test marketing bacon dogs using
the SLIT METHOD in conjunction with the special oven, in some of its
convenience stores, and, providing sales of bacon dogs in the test markets were
successful, 7-11 would be interested in purchasing large quantities of bacon dogs
using the SLIT METHOD  in conjunction with the special oven.  7-11's interest in
purchasing bacon dogs using the SLIT METHOD  in conjunction with the special
oven was not publicly known.

44.   In order for SUPER CHEFS  and DEFENDANTS to jointly provide
the bacon dogs for 7-11's needs, DEFENDANTS offered to use SUPER CHEFS'
TRADE SECRETS from SUPER CHEFS in consideration of a payment of $.07
commission paid by DEFENDANTS to  SUPER CHEFS for every bacon dog sold
by DEFENDANTS to 7-11 as well as to any other company.  Attached as Exhibit
C is a true and correct copy of DEFENDANTS' offer to SUPER CHEFS.

45.   DEFENDANTS' offer to pay $.07 commission to SUPER CHEFS for
every bacon dog sold by DEFENDANTS to 7-11 as well as to any other company,
in consideration for using SUPER CHEFS' TRADE SECRETS, including the
SLIT METHOD in conjunction with the special oven, was communicated by
Robert Eversman, DEFENDANTS' Vice President of Sales and Marketing, to
Jerry Packer, President of SUPER CHEFS.

46.   Jerry Packer, President, on behalf of SUPER CHEFS then accepted
DEFENDANTS' offer of a payment of a $.07 commission  by DEFENDANTS  to

SUPER CHEFS for every bacon dog sold by DEFENDANTS to 7-11, as well as to any other company.

47.    In addition to providing DEFENDANTS with the SLIT METHOD in conjunction with the special oven, SUPER CHEFS provided DEFENDANTS with the knowledge that in order to efficiently mass produce bacon dogs, it was necessary to use a special oven.

48.    After providing DEFENDANTS with the SLIT METHOD and the knowledge as to how bacon dogs could be mass produced efficiently using the SLIT METHOD in conjunction with the special oven, SUPER CHEFS used its connections at 7-11 to provide DEFENDANTS with the opportunity to present 7-11 with the opportunity to purchase mass-produced quantities of bacon dogs from DEFENDANTS.  7-11 then entered into agreement(s) with DEFENDANTS to purchase mass-produced quantities of bacon dogs from DEFENDANTS.

49.    DEFENDANTS, after having entered into agreement(s) with 7-11 to mass produce bacon dogs for 7-11, began manufacturing bacon dogs for 7-11, and continue to do so today.

50.    DEFENDANTS are manufacturing bacon dogs for 7-11 utilizing a modified version of the SLIT METHOD in conjunction with the special oven, the knowledge of which was provided to DEFENDANTS by SUPER CHEFS.

51.    Pursuant to SUPER CHEFS' agreement with DEFENDANTS, SUPER CHEFS is entitled to a $.07 commission for every bacon dog produced and sold by DEFENDANTS to 7-11, as well as to any other company.

52.    On or about October 2, 2014, DEFENDANTS refused to pay the $.07 commission to SUPER CHEFS for every bacon dog sold by DEFENDANTS to 7-11 as well as to any other company despite DEFENDANTS' express written agreement to do so.

53.    On or about October 2, 2014, DEFENDANTS breached the terms of the Confidentiality Agreement when DEFENDANTS sold bacon dogs to 7-11, and

continue to do so,  without paying commissions to SUPER CHEFS, in violations of DEFENDANTS' obligation (1) not to use SUPER CHEFS' TRADE SECRETS to unfairly compete with SUPER CHEFS, or to obtain unfair advantage over SUPER CHEFS, and (2) not to use SUPER CHEFS' TRADE SECRETS in connection with any commercial activity which may be comparable to the commercial activity that the parties had contemplated upon entering into the Confidentiality Agreement.  DEFENDANTS' actions in selling bacon dogs to 7-11 without paying the commission to which SUPER CHEFS is entitled are also violations of DEFENDANTS' obligations under the Commission Agreement and DEFENDANTS' express agreement to pay $.07 commission to SUPER CHEFS for every bacon dog sold by DEFENDANTS to 7-11 as well as to any other company.

54.    SUPER CHEFS has been informed that test markets have demonstrated that participating 7-11 stores will sell approximately ten (10) bacon dogs per day.  SUPER CHEFS has also been informed that by selling bacon dogs of varying sizes, it is likely that each participating 7-11 store will sell fifteen (15) bacon dogs per day.  SUPER CHEFS has been informed that the bacon dogs manufactured and sold by DEFENDANTS will be sold at approximately 8000 participating 7-11 stores in North America.  The $.07 commission owed to SUPER CHEFS by DEFENDANTS based upon sales of ten (10) bacon dogs sold per day at each of 7-11's approximately 8,000 participating stores is over $2,000,000.00 per year.  The $.07 commission owed SUPER CHEFS by DEFENDANTS based upon sales of fifteen (15) bacon dogs sold per day at each of 7-11's approximately 8,000 participating stores is over $3,000,000.00 per year.

55.    SUPER CHEFS performed all terms of the Confidentiality Agreement.

56.    SUPER CHEFS  never granted DEFENDANTS permission to produce bacon dogs for 7-11 without properly compensating SUPER CHEFS.

57.     DEFENDANTS' production and sale of bacon dogs to 7-11 was, and continues to be,  a breach of DEFENDANTS' contractual obligations pursuant to the terms of DEFENDANTS' written Confidentiality Agreement with SUPER CHEFS.

58.     As a proximate cause of DEFENDANTS, and each of them, having breached the terms of the Confidentiality Agreement with SUPER CHEFS, SUPER CHEFS has been damaged in an amount to be proven at trial, plus interest thereon at a rate of ten percent (10%) per annum from October 2, 2014, plus attorneys' fees pursuant to Paragraphs 8 and 12 of the Confidentiality Agreement in an amount to be proven at trial, plus costs.

59.     STONE GATE'S actions in selling bacon dogs to 7-11 without paying commissions to SUPER CHEFS is a violation of DEFENDANTS' obligation (1) not to use SUPER CHEFS' TRADE SECRETS to unfairly compete with SUPER CHEFS, or to obtain unfair advantage over SUPER CHEFS, and (2) not to use SUPER CHEFS' TRADE SECRETS in connection with any commercial activity which may be comparable to the commercial activity that the parties had contemplated upon entering into the Confidentiality Agreement. DEFENDANTS' actions in selling bacon dogs to 7-11 without paying the commission to which SUPER CHEFS is entitled are also violations of DEFENDANTS' obligations under the Commission Agreement and DEFENDANTS' express agreement to pay $.07 commission to SUPER CHEFS for every bacon dog sold by DEFENDANTS to 7-11 as well as to any other company.

## SECOND CAUSE OF ACTION
## BREACH OF WRITTEN CONTRACT (COMMISSION AGREEMENTS)
## (SUPER CHEFS Against All DEFENDANTS and DOES 1 to 100)

60.     SUPER CHEFS herein incorporates all preceding paragraphs, as though fully set forth herein.

61.     On or about November 2012, SUPER CHEFS approached DEFENDANTS' food manufacturing companies, regarding the possibility of DEFENDANTS entering into an agreement with SUPER CHEFS in order to manufacture bacon dogs using the SLIT METHOD in conjunction with the special oven, to fulfill the needs of 7-11 and other companies, and, in exchange, SUPER CHEFS would receive a commission from DEFENDANTS for every bacon dog sold by DEFENDANTS to any and all companies.

62.     Prior to disclosing SUPER CHEFS' TRADE SECRETS to DEFENDANTS, SUPER CHEFS and DEFENDANTS entered into a written Confidentiality Agreement in which, in consideration for receipt of SUPER CHEFS' TRADE SECRETS, DEFENDANTS agreed not to use SUPER CHEFS' TRADE SECRETS to "unfairly compete" with SUPER CHEFS, or to "obtain unfair advantage" over SUPER CHEFS, to maintain the confidentiality of SUPER CHEFS' TRADE SECRETS, and not to use SUPER CHEFS' TRADE SECRETS in connection with any commercial activity which may be comparable to the commercial activity that the parties had contemplated upon entering into the Confidentiality Agreement.  A true and correct copy of the written Confidentiality Agreement is attached hereto as Exhibit A.

63.     In addition to the Confidentiality Agreement, SUPER CHEFS and DEFENDANTS also entered into a written Commission Agreement.  Attached as Exhibit B is a true and correct copy of the Commission Agreement.  Pursuant to the Commission Agreement, DEFENDANTS were to receive, produce, invoice, and ship orders for products for customers that were secured by SUPER CHEFS. Both SUPER CHEFS and DEFENDANTS were required to mutually agree on the selling price for the products sold to customers secured by SUPER CHEFS.  The parties were also required to agree to the amount of commission to be received by SUPER CHEFS, prior to setting the selling price, and therefore prior to selling the products to customers secured by SUPER CHEFS.  The Commission Agreement

also specified that "Neither PARTY may circumvent the other PARTY, nor interfere in the business of the other PARTY, in any manner whatsoever, whereby the financial well-being of the other PARTY is lessened or diminished."

64.    Robert Eversman, DEFENDANTS' Vice President of Sales and Marketing, entered into the Confidentiality Agreement and the Commission Agreement on behalf of DEFENDANTS.  In an email sent on Friday, November 16, 2012, Robert Eversman, DEFENDANTS' Vice President of Sales and Marketing, notified Jerry Packer, President of SUPER CHEFS in writing that DEFENDANTS had agreed to the terms of both the Confidentiality Agreement and the Commission Agreement.  In the same email, Robert Eversman, DEFENDANTS' Vice President of Sales and Marketing, provided Jerry Packer, President of SUPER CHEFS, signed copies of the Confidentiality Agreement and the Commission Agreement.  Attached as Exhibit C is a true and correct copy of the November 16, 2012 email from Robert Eversman, DEFENDANTS' Vice President of Sales and Marketing, to Jerry Packer, President of SUPER CHEFS.

65.    The parties' Confidentiality Agreement included a provision in which DEFENDANTS agreed:

> not to use any Confidential Information of the Disclosing Party to unfairly compete or obtain unfair advantage vis a vis Disclosing Party in any commercial activity which may be comparable to the commercial activity contemplated by the parties in connection with the Business Purposes;

Exh. A, Section 2d.

66.    Pursuant to Paragraph 2d of the Confidentiality Agreement, the Confidentiality Agreement expressly precluded DEFENDANTS from using SUPER CHEFS' TRADE SECRETS  "to unfairly compete or obtain unfair advantage" "in any commercial activity which may be comparable to the commercial activity contemplated by the parties in connection with the Business Purposes."

67.    Similarly, the Commission Agreement precluded DEFENDANTS

18

1  from selling bacon dogs manufactured by DEFENDANTS using SUPER CHEFS'
2  TRADE SECRETS to 7-11, without first agreeing with SUPER CHEFS as to the
3  price to be charged to 7-11, and as to the commission that would be received by
4  SUPER CHEFS.

5      68.    After SUPER CHEFS' TRADE SECRETS had been disclosed to
6  DEFENDANTS pursuant to the terms of the Confidentiality Agreement and the
7  Commission Agreement, DEFENDANTS stated that they were interested in
8  manufacturing bacon dogs using the SLIT METHOD in conjunction with the
9  special oven as well as manufacturing other products formulated by SUPER
10 CHEFS, and DEFENDANTS would pay a commission to SUPER CHEFS for
11 every unit of every product sold by DEFENDANTS.  The bacon dogs
12 manufactured using the SLIT METHOD in conjunction with the special oven
13 would be sold by DEFENDANTS to 7-11 and to other customers.

14     69.    In reliance on DEFENDANTS signing the Confidentiality Agreement
15 and the Commission Agreement, SUPER CHEFS spent a tremendous amount of
16 time and expended substantial energy and resources providing samples of bacon
17 dogs using the SLIT METHOD in conjunction with the special oven to 7-11,in
18 order to establish that the SLIT METHOD in conjunction with the special oven
19 met 7-11's needs and met with the approval of those in charge at 7-11.  After the
20 SLIT METHOD in conjunction with the special oven had been extensively
21 evaluated by those in charge at 7-11, 7-11 told SUPER CHEFS that it had "broken
22 the code" and developed the method for producing bacon dogs that 7-11 had been
23 seeking for years.

24     70.    After telling SUPER CHEFS that it had "broken the code" and
25 developed the method to produce the bacon dogs that 7-11 was looking for, 7-11
26 informed SUPER CHEFS that it was interested in test marketing bacon dogs using
27 the SLIT METHOD in conjunction with the special oven, in some of its
28 convenience stores, and, providing sales of bacon dogs in the test markets were

PLAINTIFF SUPER CHEFS, INC.'S FIRST AMENDED COMPLAINT

successful, 7-11 would be interested in purchasing large quantities of bacon dogs using the SLIT METHOD in conjunction with the special oven. 7-11's interest in purchasing bacon dogs using the SLIT METHOD in conjunction with the special oven was not publicly known.

71.     In order for SUPER CHEFS and DEFENDANTS to jointly provide the bacon dogs for 7-11's needs, DEFENDANTS offered to use SUPER CHEFS' TRADE SECRETS from SUPER CHEFS in consideration of a payment of $.07 commission paid by DEFENDANTS to SUPER CHEFS for every bacon dog sold by DEFENDANTS to 7-11 as well as to any other company. Attached as Exhibit D is a true and correct copy of DEFENDANTS' offer to SUPER CHEFS.

72.     DEFENDANTS' offer to pay $.07 commission to SUPER CHEFS for every bacon dog sold by DEFENDANTS to 7-11 as well as to any other company, in consideration for using SUPER CHEFS' TRADE SECRETS, including the SLIT METHOD in conjunction with the special oven, was communicated by Robert Eversman, DEFENDANTS' Vice President of Sales and Marketing, to Jerry Packer, President of SUPER CHEFS.

73.     Jerry Packer, President, on behalf of SUPER CHEFS then accepted DEFENDANTS' offer of a payment of a $.07 commission by DEFENDANTS to SUPER CHEFS for every bacon dog sold by DEFENDANTS to 7-11, as well as to any other company.

74.     In addition to providing DEFENDANTS with the SLIT METHOD, SUPER CHEFS provided DEFENDANTS with the knowledge that in order to efficiently mass produce bacon dogs, it was necessary to use a special oven. SUPER CHEFS used a tremendous amount of effort, time, and resources in locating several special ovens. SUPER CHEFS also spent a tremendous amount of effort, time, and resources producing samples of bacon dogs in several special ovens, comparing and evaluating the results related to cooking the bacon dogs.

75.     After providing DEFENDANTS with the SLIT METHOD and the

knowledge as to how bacon dogs could be mass produced efficiently using the SLIT METHOD in conjunction with the special oven, SUPER CHEFS used its connections at 7-11 to provide DEFENDANTS with the opportunity to present 7-11 with the opportunity to purchase mass-produced quantities of bacon dogs from DEFENDANTS.  PLAINTIFF believes and on that basis alleges that 7-11 then entered into agreement(s) with DEFENDANTS to purchase mass-produced quantities of bacon dogs from DEFENDANTS.

76.    DEFENDANTS, after having entered into agreement(s) with 7-11 to mass produce bacon dogs for 7-11, began manufacturing bacon dogs for 7-11, and continue to do so today.

77.    DEFENDANTS are manufacturing bacon dogs for 7-11 utilizing a modified version of the SLIT METHOD in conjunction with the special oven, the knowledge of which was provided to DEFENDANTS by SUPER CHEFS.

78.    Pursuant to SUPER CHEFS' agreement with DEFENDANTS, SUPER CHEFS is entitled to a $.07 commission for every bacon dog produced and sold by DEFENDANTS to 7-11, as well as to any other company.

79.    On or about October 2, 2014, DEFENDANTS refused to pay the $.07 commission to SUPER CHEFS for every bacon dog sold by DEFENDANTS to 7-11 as well as to any other company despite DEFENDANTS' express written agreement to do so.

80.    On or about October 2, 2014, DEFENDANTS breached the terms of the Confidentiality Agreement when DEFENDANTS sold bacon dogs to 7-11, and whom continue to do so, without paying commissions to SUPER CHEFS, in violations of DEFENDANTS' obligation (1) not to use SUPER CHEFS' TRADE SECRETS to unfairly compete with SUPER CHEFS, or to obtain unfair advantage over SUPER CHEFS, and (2) not to use SUPER CHEFS' TRADE SECRETS in connection with any commercial activity which may be comparable to the commercial activity that the parties had contemplated upon entering into the

Confidentiality Agreement.

81.     On or about October 2, 2014, DEFENDANTS also breached the terms of the Commission Agreement and DEFENDANTS' express agreement to pay a commission of $.07 to SUPER CHEFS for every bacon dog sold to 7-11 as well as to any other company, when DEFENDANTS sold, and continue to sell bacon dogs to 7-11 without paying the commission to which SUPER CHEFS is entitled.

82.     SUPER CHEFS has been informed that test markets have demonstrated that participating 7-11 stores will sell approximately ten (10) bacon dogs per day.  SUPER CHEFS has also been informed that by selling bacon dogs of varying sizes, it is likely that each participating 7-11 store will sell fifteen (15) bacon dogs per day.  SUPER CHEFS has been informed that the bacon dogs manufactured and sold by DEFENDANTS will be sold at approximately 8000 participating 7-11 stores in North America.  The $.07 commission owed to SUPER CHEFS by DEFENDANTS based upon sales of ten (10) bacon dogs sold per day at each of 7-11's approximately 8,000 participating stores is over $2,000,000.00 per year.  The $.07 commission owed SUPER CHEFS by DEFENDANTS based upon sales of fifteen (15) bacon dogs sold per day at each of 7-11's approximately 8,000 participating stores is over $3,000,000.00 per year.

83.     SUPER CHEFS performed all terms of the Commission Agreement and DEFENDANTS' express agreement to pay a commission of $.07 to SUPER CHEFS for every bacon dog sold to 7-11, as well as to any other company.

84.     SUPER CHEFS never granted DEFENDANTS permission to produce bacon dogs for 7-11 without properly compensating SUPER CHEFS.

85.     DEFENDANTS' production and sale of bacon dogs to 7-11 was, and continues to be, a breach of DEFENDANTS' contractual obligations pursuant to the terms of the Commission Agreement and DEFENDANTS' express agreement to pay a commission of $.07 to SUPER CHEFS for every bacon dog sold to 7-11,

as well as any other company.

86.     As a proximate cause of DEFENDANTS, and each of them, having breached the terms of the Commission Agreement and DEFENDANTS' express agreement to pay a commission of $.07 to SUPER CHEFS for every bacon dog sold to 7-11, as well as to any other company, SUPER CHEFS has been damaged in an amount to be proven at trial, plus interest thereon at a rate of ten percent (10%) per annum from October 2, 2014, plus costs.

## THIRD CAUSE OF ACTION
## FRAUD
### (SUPER CHEFS Against All DEFENDANTS and DOES 1 to 100)

87.     SUPER CHEFS herein incorporates all preceding paragraphs, as though fully set forth herein.

88.     In or about March, 2014, pursuant to the Commission Agreement, the STONE GATE and SUPER CHEFS agreed to a seven cent ($.07) commission based on the proposed cost structure and retail selling price of the bacon dogs.  In reliance on this agreement, SUPER CHEFS continued to work with STONE GATE, providing it with significant expertise, legal and technical advice, contacts and capital investment.  This was done in reliance upon DEFENDANTS' representations leading SUPER CHEFS to believe that the Commission Agreement and agreed upon $.07 commission were controlling.  At no time did DEFENDANTS indicate to SUPER CHEFS that the Commission Agreement was, for any reason, no longer operational or that the agreed-upon commission had been revised.

89.     Contrary to STONE GATE's foregoing representations and omissions, the reality was that STONE GATE had decided at some time prior to October, 2014, not to honor the Commission Agreement and agreed-upon $.07 commission.  Accordingly, DEFENDANTS knew at the time when made that their

**PLAINTIFF SUPER CHEFS, INC.'S FIRST AMENDED COMPLAINT**

representations to SUPER CHEFS, between March and October 2014, as set forth herein, were false and/or misleading.  DEFENDANTS continued to lead SUPER CHEFS to believe that it would honor the Commission Agreement and mutually agreed-upon $.07 commission, in order to induce SUPER CHEFS to continue to offer its considerable experience, expertise, innovation, hard work and capital investments to ensure the success of the bacon dog deal with 7-11.

90.    As a result of DEFENDANTS' fraudulent conduct, SUPER CHEFS has been damaged by DEFENDANTS in an amount according to proof at trial.

91.    The aforementioned conduct of DEFENDANTS constituted making intentional misrepresentations, deceit, and concealment of material facts known to the DEFENDANTS, with the intention on the part of the DEFENDANTS of thereby depriving SUPER CHEFS of property or legal rights or otherwise causing damages, and was despicable conduct that subjected SUPER CHEFS  to a cruel and unjust hardship in conscious disregard of SUPER CHEFS' rights, so as to justify an award of exemplary and punitive damages.

## FOURTH CAUSE OF ACTION
## NEGLIGENT MISREPRESENTATION
### (SUPER CHEFS Against All DEFENDANTS and DOES 1 to 100)

92.    SUPER CHEFS herein incorporates all preceding paragraphs, as though fully set forth herein.

93.    In or about March, 2014, pursuant to the Commission Agreement, the STONE GATE and SUPER CHEFS agreed to a seven cent ($.07) commission based on the proposed cost structure and retail selling price of the bacon dogs.  In reliance upon this agreement, SUPER CHEFS continued to work with STONE GATE, providing it with significant expertise, legal and technical advice, contacts and capital investment.  This was done in reliance upon STONE GATE's representations leading SUPER CHEFS to believe that the Commission

Agreement and agreed upon $.07 commission were controlling.  At no time did DEFENDANTS indicate to SUPER CHEFS that the Commission Agreement was, for any reason, no longer operational or that the agreed-upon commission had been revised.

94.     Contrary to DEFENDANTS' foregoing representations and omissions, the reality was that STONE GATE had decided at some time prior to October, 2014, not to honor the Commission Agreement and agreed-upon $.07 commission.  Accordingly, DEFENDANTS made the representations to SUPER CHEFS between March and October 2014, as set forth herein, without any reasonable basis for their truthfulness.  DEFENDANTS continued to lead SUPER CHEFS to believe that it would honor the Commission Agreement and mutually agreed-upon $.07 commission, in order to induce SUPER CHEFS to continue to offer its considerable experience, expertise, innovation, hard work and capital investments to ensure the success of the bacon dog deal with 7-11.

95.     As a result of DEFENDANTS' negligence, SUPER CHEFS has been damaged by DEFENDANTS in an amount according to proof at trial.

## FIFTH CAUSE OF ACTION
## INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS
### (SUPER CHEFS Against All DEFENDANTS and DOES 1 to 100)

96.     SUPER CHEFS herein incorporates all preceding paragraphs, as though fully set forth herein.

97.     Beginning in or around April 2012, SUPER CHEFS had been working on developing a bacon dog which would satisfy the standards of 7-11 for the purpose of manufacturing and supplying (with the assistance of a food manufacturer) bacon dogs to all of 7-11's convenience stores.  Beginning on or around February 19, 2014, SUPER CHEFS had met with 7-11 and had presented

samples of a prototype bacon dog.  The prototype was well received by 7-11 representatives, who requested additional samples for market testing.  Absent interference by any outside forces, SUPER CHEFS could have reasonably expected to realize significant profits from the resulting economic relationship with 7-11, including the sale of bacon dogs in about 8,000 stores operated by 7-11, as well as sales to other customers.

98.    As of February 2014, DEFENDANTS were well aware of all of the facts laid out in the preceding paragraph.

99.    In an effort to increase its profits at the expense of SUPER CHEFS, DEFENDANTS used SUPER CHEFS' contacts, ideas, experience, research, advice and financial backing to develop its own bacon dog and pitch the idea to 7-11, in abrogation of the parties' Confidentiality Agreement and Commission Agreement.  Furthermore, DEFENDANTS did not inform SUPER CHEFS that it would be abrogating the parties' Confidentiality Agreement and Commission Agreement and striking its own deal with 7-11, so that SUPER CHEFS would continue to provide advice and support to STONE GATE, thereby ensuring the success of the STONE GATE deal.

100.    As a result of DEFENDANTS' actions, SUPER CHEFS was cut out of the bacon dog agreement that 7-11 eventually entered into with STONE GATE.

101.    As a result of DEFENDANTS' interference with SUPER CHEFS' prospective economic advantage, SUPER CHEFS has been damaged in an amount according to proof at trial.

## SIXTH CAUSE OF ACTION
## NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS
## (SUPER CHEFS Against All DEFENDANTS and DOES 1 to 100)

102.    SUPER CHEFS herein incorporates all preceding paragraphs, as though fully set forth herein.

103.   Beginning in or around April 2012, SUPER CHEFS had been working on developing a bacon dog which would satisfy the standards of 7-11 for the purpose of manufacturing and supplying (with the assistance of a food manufacturer) bacon dogs to all of 7-11's convenience stores.  Beginning in or around February 2014, SUPER CHEFS had met with 7-11 and had presented samples of a prototype bacon dog.  The prototype was well received by 7-11 representatives, who requested additional samples for in-house corporate testing.  Absent interference by any outside forces, SUPER CHEFS could have reasonably expected to realize significant profits from the resulting economic relationship with 7-11, including the sale of bacon dogs in about 8,000 stores operated by 7-11, as well as sales to other customers.

104.   As of February 2014, DEFENDANTS were well aware of all of the facts laid out in the preceding paragraph.

105.   In an effort to increase its profits at the expense of SUPER CHEFS, DEFENDANTS used SUPER CHEFS' contacts, ideas, experience, research, advice and financial backing to develop its own bacon dog and pitch the idea to 7-11, in abrogation of the parties' Confidentiality Agreement and Commission Agreement.  Furthermore, DEFENDANTS did not inform SUPER CHEFS that it would be abrogating the parties' Confidentiality Agreement and Commission Agreement and striking its own deal with 7-11, so that SUPER CHEFS would continue to provide advice and support to STONE GATE, thereby ensuring the success of the STONE GATE deal.

106.   DEFENDANTS knew or should have known that their actions were likely to disrupt the relationship between SUPER CHEFS and 7-11.

107.   As a result of DEFENDANTS' actions, SUPER CHEFS was cut out of the bacon dog agreement that 7-11 eventually entered into with STONE GATE.

108.   As a result of DEFENDANTS' interference with SUPER CHEFS' prospective economic advantage, SUPER CHEFS has been damaged in an amount

**PLAINTIFF SUPER CHEFS, INC.'S FIRST AMENDED COMPLAINT**

according to proof at trial.

## SEVENTH CAUSE OF ACTION

## UNFAIR BUSINESS PRACTICES (Bus. & Prof. Code § 17200 et seq.)

## (SUPER CHEFS Against All DEFENDANTS and DOES 1 to 100)

109.   SUPER CHEFS herein incorporates all preceding paragraphs, as though fully set forth herein.

110.   Throughout the time SUPER CHEFS and DEFENDANTS were engaged in business dealings relating to selling bacon dogs to 7-11, DEFENDANTS engaged in the unfair business practices described above, each of which is specifically incorporated into this Cause of Action by reference.

111.   DEFENDANTS, and each of them, by engaging in such unlawful, unfair, deceptive, and fraudulent practices alleged herein, have enriched themselves at the expense of SUPER CHEFS and have gained an unfair competitive advantage over law-abiding individuals and entities.

## EIGHTH CAUSE OF ACTION

## ACCOUNTING

## (SUPER CHEFS Against All DEFENDANTS and DOES 1 to 100)

112.   SUPER CHEFS herein incorporates all preceding paragraphs, as though fully set forth herein.

113.   SUPER CHEFS is entitled to and hereby demands that DEFENDANTS provide a complete and thorough financial accounting of all transactions involving DEFENDANTS' breach of contract and misappropriation of SUPER CHEFS' economic activities, including, but not limited to, any and all transactions between DEFENDANTS and 7-11, and any other transactions involving bacon dogs.

## NINTH CAUSE OF ACTION

## DECLARATORY RELIEF

### (SUPER CHEFS  Against All DEFENDANTS and DOES 1 to 100)

114.   SUPER CHEFS herein incorporates all preceding paragraphs, as though fully set forth herein.

115.   An actual controversy has arisen and now exists between SUPER CHEFS and DEFENDANTS concerning the parties' obligations pursuant to (1) SUPER CHEFS' TRADE SECRETS, (2) Confidentiality Agreement, (3) Commission Agreement, and (4) DEFENDANTS' express agreement to pay a commission of $.07 for every bacon dog produced and sold by DEFENDANTS to 7-11, as well as to any other company.  Specifically,  SUPER CHEFS contends that DEFENDANTS have failed to compensate SUPER CHEFS for providing SUPER CHEFS' TRADE SECRETS to DEFENDANTS and assisting DEFENDANTS in developing and marketing the bacon dog to 7-11.  In particular, SUPER CHEFS contends that DEFENDANTS are now using SUPER CHEFS' TRADE SECRETS to sell bacon dogs to 7-11, and possibly to other companies, and have failed to compensate SUPER CHEFS for providing SUPER CHEFS' TRADE SECRETS to DEFENDANTS to enable DEFENDANTS to do so. DEFENDANTS contend that they need not compensate SUPER CHEFS.

116.   SUPER CHEFS desires a judicial determination of its rights and duties, DEFENDANTS' obligations to SUPER CHEFS, and a declaration that (1) SUPER CHEFS' TRADE SECRETS are legally protected trade secrets, (2) that DEFENDANTS are obligated to compensate  SUPER CHEFS for having used, and continuing to use, SUPER CHEFS' TRADE SECRETS, and (3) that DEFENDANTS must compensate  SUPER CHEFS for DEFENDANTS' use of SUPER CHEFS' TRADE SECRETS in the future, and (4) that DEFENDANTS must provide SUPER CHEFS with a full and complete accounting of all transactions involving DEFENDANTS' use of SUPER CHEFS' TRADE

SECRETS.

117.   A judicial declaration is necessary and appropriate at this time under the circumstances, in order that  SUPER CHEFS may ascertain its rights and duties and DEFENDANTS' obligations to SUPER CHEFS related to SUPER CHEFS' TRADE SECRETS, pursuant to the Confidentiality Agreement and Commission Agreement.  Should this Court not deem DEFENDANTS required to compensate SUPER CHEFS for the use of SUPER CHEFS' TRADE SECRETS, DEFENDANTS' wrongful conduct will cause great and irreparable injury to SUPER CHEFS.

## DEMAND FOR TRIAL BY JURY

## FRCP 38(b)

118.   Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, SUPER CHEFS demands a trial by jury on all issues triable of right by a jury under the Constitution, and laws of the United States of America.

## PRAYER FOR RELIEF

119.   WHEREFORE, SUPER CHEFS prays for judgment as follows:

**On All Causes of Action:**

1.    For special damages in an amount according to proof at trial;

2.    For general damages in an amount according to proof at trial;

3.    For interest at a rate of 10% per annum from October 2, 2014;

4.    For costs of suit incurred herein; and

5.    For such other and further relief as this Court may deem just and proper.

**On The First Causes of Action:**

1.    For SUPER CHEFS' reasonable attorneys' fees.

**On The Third and Seventh Causes of Action:**

 1.  For exemplary and punitive damages.

**On The Eighth Cause of Action:**

 1.  For an accounting of all transactions between any of the DEFENDANTS and 7-11 since December 2012.

 2.  For an accounting of all transactions between any of the DEFENDANTS and any other retailer or wholesaler for the supply of bacon dogs.

**On The Ninth Causes of Action:**

 1.  For a declaration that the Confidentiality Agreement is in force and binding upon the parties thereto, including DEFENDANTS.

 2.  For a declaration that DEFENDANTS are in breach of the Confidentiality Agreement.

 3.  For a declaration that the Commission Agreement is in force and binding upon the parties thereto, including DEFENDANTS.

 4.  For a declaration that DEFENDANTS are in breach of the Commission Agreement.

 5.  For a declaration that the agreement of a $.07 commission per bacon dog in force and binding upon the parties thereto, including STONE GATE.

 6.  For a declaration that DEFENDANTS are obligated to pay SUPER CHEFS $.07 commission per bacon dog sold to 7-11 or any other company from March 28, 2014 through time immemorial.

 6.  For a declaration that SUPER CHEFS' TRADE SECRETS are legally protected trade secrets.

1

2    Dated: July 6, 2015                THE ALTMAN LAW GROUP

3

4                                        By:   /s/ Bryan C. Altman
                                               Bryan C. Altman, Esq.
5                                              Joel E. Elkins, Esq.
                                               Jordan G. Cohen, Esq.
6
                                         Attorneys  for Plaintiff SUPER CHEFS,
7                                        INC.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PLAINTIFF SUPER CHEFS, INC.'S FIRST AMENDED COMPLAINT**